Good morning and welcome to the Ninth Circuit. Silva Pereira is submitted on the briefs. We'll hear argument in Ashien v. Barr. You may proceed. Good morning, Your Honors. Joshua Ferris Ackerman for the petitioner. Mike Ashien. I'd like to reserve four minutes of my time for rebuttal. Mr. Ashien was entitled to a competent translation of his hearing in a language that he spoke fluently. If what happened below, in this case, in front of the IJ, passes for a vindication of that right, it's a farce. What Mr. Ashien got was an inadequate translation in his third choice language delivered by an interpreter with whom he struggled to communicate, including at key portions of the hearing that led, ultimately, to the BIA's decision to decide that he wasn't credible. Can a petitioner in a circumstance like this flip back and forth between sort of pidgin English and the native language? Is that? And is that what happened here? Well, Your Honor, in the record, there are a few instances, and they're marked with bracketed in English, where Mr. Ashien intervened in English. But that doesn't show that he was capable of conducting his entire hearing in English. This court's at some point in the hearing say, let's do this in English. He did. And at that point, that was after two things had happened. One, IJ Munoz had said to him that if he didn't proceed in English, she was going to deport him. Then he agreed to proceed in English. The second time it happened was after he had been detained for nearly 11 months, and he was essentially begging the IJ to proceed with his hearing. Because he had no indication. No one ever told him he had a right to a translator. There was no end in sight for him in this detention. And he said, look, I have a family. I can't spend my entire life detained here. And so at that point, yes, Your Honor, he acquiesced to proceeding in English, a position that he later reversed again when offered the opportunity to proceed in a different language. That is not the kind of knowing, intelligent waiver of a fundamental right that this court should credit. I wonder if due process is a fairly steep hill to climb in reversing the immigration judge and then the BIA. Are the same arguments valid if you were to look at the credibility finding? Well, yes, Your Honor. I think here there's a very clear linkage between the failure to provide Mr. Ashen a competent translation and the bases for the BIA's decision that he wasn't credible. The BIA's first reason was that the IJ had deemed Mr. Ashen evasive and non-responsive at times. And this court has cautioned that when you have a situation where there's a translation and there are questions about the translation, that's a very suspect basis to deem someone not credible. The government has apparently elected not to defend that ground of the BIA's decision here before this court. But that was the very first thing that the BIA cited. And in fact, if you look at the IJ's basis for that evasiveness determination, the first instance that the IJ cited was this farcical exchange about Mr. Ashen's uncle, which is discussed in the briefs at some length. And I would encourage the court to read that, because I think it's clear on a relatively simple matter, his relationship to his uncle, he had just tremendous difficulty explaining himself. And so yes, Your Honor, I do believe that because of this link between the adverse credibility determination and the translation problems, including what the Eighth Circuit has recognized in the Tun case, that when you have translation issues, it can lend this air of evasiveness to the entire proceeding. And we sitting here today on a cold record can't calculate what effect that might have had on the IJ. What do we do? Although the IJ's decision was fairly expansive, and I agree that the whole question over the exchange over the nephew was just ridiculous, and that the only person who really understood what was going on was Mr. Ashen, and everybody else seemed to. I mean, the IJ misstated things a couple of times, just misquoted. But the BIA doesn't really rely on that and really focuses on the question of the vehicles, and then the question of the omissions from the application. Those are things that Mr. Ashen accepts full responsibility for, and he didn't say anything about having been hung upside down by Boko Haram. Well, I want to address your question. So there's two things there. And respectfully, I disagree about the basis for the BIA's decision. And if you look at the bottom of AR3, we find the first reason here, which is specifically the immigration judge found the respondent's testimony was vague and non-responsive, especially when testifying about his knowledge of the English language. That was mixed in with the uncle exchange. And if you actually look there, what the BIA cites is the IJ at 10 to 11, which is the IJ's vague and implausible determination, and then a series of cases from the BIA that deal with demeanor determinations. And then if you go on to page 4, what Your Honor just testified about, Judge Bybee, the vehicle issue, that paragraph begins with, moreover. So I believe it is clear from the BIA's decision that this demeanor was a piece of it. Now, turning to Your Honor's second point about the other two issues, the vehicles and the omission, on the vehicles, first of all, there's it's not clear that there is an inconsistency. If you actually look carefully at the port of entry statement, it's not 100% certain. I think it's ambiguous. You could read it as saying that he had repaired multiple vehicles, but you could just as easily read it as saying that he saw multiple vehicles. And the problem with that is that it's not a verbatim translation or transcription of what Mr. Asheon said. So we're splitting hairs about an ambiguous statement, and we don't even know if it's what he really said. And moreover, we know that the port of entry statement itself wasn't translated. So here, Mr. Asheon's English abilities are obviously subject to serious doubt, and this court has held in the same case that when you are going to attempt to use a port of entry statement to assess a petitioner's credibility, the IJ needs to take into account the circumstances surrounding that statement. The IJ didn't do that here. There's no discussion of whether that is an adequate reflection of what Mr. Asheon said, or if he was able to communicate properly with the port of entry officer. Now we're on rebuttal. Could you give us a record citation for when the IJ said, if you don't speak English, I'll deport you? Yes, I can, Your Honor. And that is AR 161. Thank you. And I'll reserve the rest of my time. Thank you. Good morning. Alice and Igo, representing the respondent in this case. I'd like to, before I go to my argument, I'd just like to correct something that Mr. Ackerman said. He said that Mr. Asheon did not know he had the right to have an attorney, rather have an interpreter. On page AR 195, the court specifically notes that he had a Rodriguez hearing because he was detained, and he waived his right. So he was told that he had a right that he could have an interpreter, and he actually waived the right to have an interpreter at his bond hearing, which he conducted himself. Mr. Ackerman also said that just as easily, it doesn't matter whether there was an inconsistency, whether he did multiple or single vehicles. And that's the point. Because in this case, the board said, even assuming credibility, we agree with the immigration judge's decision on material support. Because Mr. Ackerman was found to have material support to Boko Haram, he is ineligible. He's barred from asylum, withholding of removal under the statute, and withholding of removal under the Convention Against Torture. The only thing that he was eligible for was deferral of removal under the Convention Against Torture. And the immigration judge and the board affirmed he was not eligible because he could not show that the government of Nigeria acquiesced or consented in this. And in fact, the record here is rife with instances in which the government has fought back Boko Haram, moved them out of their territory, and while they are a moving target, the government clearly is advancing against them. And so he did not prove eligibility for the only thing which he was eligible for. So regardless of the issue of his credibility, he is barred from asylum and withholding of removal. But if the immigration judge had concluded that he was credible when saying Boko Haram had kidnapped him and forced him to repair these vehicles, that would make him more eligible for asylum withholding, wouldn't it? No. No, it would not, because there is no exception under the statute. And the case law is very, very clear for either duress or for a de minimis amount of support. The reason for that is because there are waivers of the bar that an eligible alien can apply for. And that appears in the petitioner's reply brief in which he said that this is important because if he were credible, he would be eligible for one of these waivers. Unfortunately, under a due process argument, those waivers are in the discretion of the Secretary of Homeland Security or in the discretion of the Attorney General. And so due process does not apply. That determination has not been made yet, correct? If it were to go back, would he not still be potentially eligible for a discretionary waiver if it was determined that what happened was de minimis? He might be, yes. But under a due process argument, it doesn't apply because that is discretionary and he does not have a liberty interest in that relief. And so when he raises that as a due process argument, it doesn't work for him because he cannot claim a liberty interest. And if you don't have a liberty interest in the relief that you're seeking, then you cannot claim a due process violation. And that's the issue here. I'd also like to just turn to the issue of the translation. And I'd like to put this into context. The petitioner in this case sought a visa in January of 2013, which he was denied. Two years later, he decided to make his own way into the United States. And he came in through the port of entry where he was apprehended. He was, in that sworn statement, he is clearly asked, do you speak English? Do you read, write, and do you understand English? That's AR 478. He says, yes, I understand it. He's asked multiple times. And he, in fact, says, I had six years of English in school. He later on tries to walk that back by saying, oh, I only had one day a week. But he is asked on multiple occasions in that sworn statement whether he understands English. And when you read that statement, you realize that his answers to the questions are very, very clear. After that, he is sent for a credible fear interview. And there is a, in the record on page 732, there is the credible fear interview transcript. It's not a direct transcript. But he is, again, asked on multiple occasions. And the asylum officers who interview are trained to ask them to make sure. And at the very end of that transcript, you can see he says, did you understand everything? And he says, yes. The IJ's statement, some might suggest a threat at AR-161. Do you agree that the IJ said, if you don't speak English, I'm going to deport you? I would rely on what Petitioner's counsel said, which is that you have a cold record here. And unless you hear what the tone of that was, she could have just been saying, I'm going to have to deport you if you don't cooperate with me. Well, that's not necessarily a threat. As counsel representative, whether you say it in a nice way or a threatening way, the words mean the same thing. The words mean the same thing. But I think what was frustrating the judge in this case, and in fact, she says, as he comes in, because on 11-30-2015, he's told all of a sudden that this is a very serious case for you because you have a material support question, an issue. And you really need to be very clear. And the light bulb goes off because after that, the judge notices, oh, he was very clear at his prior hearing. And if you look at, in the context, everything that he said through his hearing and everything that he said in his credible fear interview, all of it is consistent with the exception of how many vehicles he repaired. He tries to walk that back in his testimony. And then this omission in his asylum application. He prepared his asylum application by himself. It's coherent. It tracks what he said at his hearing. He prepared his, that's at 687 is the statement, his statement that he appends to his application. He prepares a pro se supplement to that with a second statement that is very coherent and tracks what he then subsequently testifies to in court. Counsel, I mean, there are a lot of really interesting questions about who understood what. The transcripts in this case of the hearings really are a disaster, though. The exchanges as to what languages he speaks, what variations he's willing to do, his complaints about the interpreter when he does get an interpreter, the IJ's own misstatements when the IJ will repeat back things that she has just heard and she will misstate what the transcript says. I agree with you, Your Honor. And most of that confusion, when you read this, I understand from your questions that you have read the transcript. Most of that confusion is in the very beginning part. And this was then transferred to another judge who held the majority of the hearing. And the previous exchanges were not taken into account. His testimony, there is one occasion where he says in English, you know, I don't agree with the way he translates. It's a single occasion that he says that. Petitioner's counsel keeps saying, oh, he doesn't understand this clear evidence. There is not clear evidence when you read this transcript. It's clear he is understanding and that he is responding consistent with his prior credible fear statement and his prior sworn statement at the border. I think we all understand that immigration court is different from district court. But my experience in district court was where you had a translator, you'd say, the translator is the translator. Counsel, witness, no one can argue with what the translator says. And you set a firm rule at the start of the proceeding. So there's no waffling. That didn't occur here. But Your Honor, again, I return to petitioner's counsel still has not shown what happened in this, like where the testimony was confusing or where it was unclear. Because all of his testimony, when you read his testimony, and the interpreter was not in his credible fear interview and was not at the border when he gave his sworn statement. It's consistent with what he says about his family, about where he lived. I'll tell you an example we haven't spoken about is about whether Boko Haram was active in Lagos. And then that's cited as an example, I believe, of non-responsiveness or evasiveness. But when you read that whole section of the transcript, he answered. So how do you interpret that segment and that issue? I would say, I would return to the board's decision, which is that he does not deny that he repaired some vehicles, whether it's one or whether it's 10. No, no, I'm asking about Lagos. There may have been some confusion, but I think that on his part, he was waffling around a little bit. Because when you look at his visa application in 2013, he gives both as his address and his home address and his mailing address as Lagos, when he claimed to be in Montgomery. So I think that what was happening with him is that he was trying to walk out. Well, we're both speaking English, but I don't think you're quite understanding my question. The question had to do with what was going on in Lagos, and that's kind of cited as, well, you're not answering the question, but he answers the question. So here we even have a situation where I'm trying to be clear in English, but maybe not as precise as I should be. But you're now answering about a whole nother issue. I was just focusing on Lagos and would appreciate your comments on that segment. If you could point me to where that is, Your Honor, please. Oh, I'm sorry. I've got it on the computer. Yeah, I don't have it in front of me, so I don't know the context. All right, I can go back and find it if you can't locate it, but thank you. Yeah, and I apologize for that. Your time has expired, but I would like to let you make a summing up. The adverse credibility decision in this is not dispositive because he is barred. He has conceded, he does not argue that at some point he repaired, he was taken for his expertise in repairing vehicles. And although he tries to walk it back, he repaired some vehicles. There's no de minimis or coercion exception to that. So he is barred from relief. He cannot claim a due process violation for the denial of a waiver because he doesn't have a liberty interest in that. And he is clearly not eligible for deferral of removal under the Convention Against Torture. Thank you very much. Thank you. You might take a look. I'm now looking at the transcript at 439, just for informational purposes. You have some rebuttal time. Thank you, Your Honor. I'd like to just pick up right where Ms. Igoe left off on the waiver issue. And first of all, just so we're all clear, if this court holds that, except but for the material support bar issue, Mr. Ashen would be eligible for asylum, then he can go apply for this waiver. And he can get the waiver either because any alleged material support he provided was under duress or because it was de minimis. And he has not done that yet. And as of now, the adverse credibility determination is preventing him from applying for that waiver. And so what Ms. Igoe suggests is essentially a catch-22 for Mr. Ashen, we can't use the waiver to evaluate whether the translation and the adverse credibility determination hurt him because he's not eligible to apply for the waiver because of the adverse credibility determination. If that can't possibly be the way that this should work, because then someone in Mr. Ashen's shoes could never avail himself of the waiver process at all. The second point, I looked at the record at what Ms. Igoe cited on 195, which I believe is the page, where Mr. Ashen was supposedly advised about his right to a translator. I didn't see that there. But in any event, I would submit that whether at some point someone may have told him that he could have a translator, he would be more inclined to believe the IJ who told him that he would be deported if he didn't proceed in English. And after, as you see, the length of time that he was detained without having a competent translator, I think there's no reason to think that he believed that was available to him. The third point on the credible fear interview and the port of- If we were to send this back, what do we send it back for? Are they going to be able to find somebody in Ibanque? Well, Your Honor, I think they could, yes. I mean, it looks like they tried, and they tried for some time. And he got pretty frustrated about that and finally decided that he'd just beg them, as you acknowledged. Well, so I think it is possible to find an Ibanque interpreter. I've called around and they are available. Number two, I think that in light of the failures of the adverse credibility termination, this court could deem Mr. Ashing credible. And if it does that- That's a huge step on a miserable record. Okay, understood, Your Honor. But it is an option. This court has done it multiple times before. In the alternative, yes, you could send it back for a new hearing with a competent translator and give Mr. Ashing a fair opportunity to present his case. A couple other things on what Ms. Igoe said. She said that the port of entry statement in the credible fear interview that he acknowledged the statements were accurate, that is essentially worthless in a situation like this where he doesn't speak English. This court has recognized that in the IMO case, which is cited in the briefs. And even the IJ, who at one point recognized after further interaction with him that proceeding in English would likely be a violation of due process. That was her assumption. That was her assessment of Mr. Ashing's English abilities. And that's on page 208 of the record. Lastly, on the vehicle issue, the government has come up with this theory that Mr. Ashing changed his story on the vehicles to avoid application of the material support bar. That's just not plausible. There's no evidence of that in the record. The page that Ms. Igoe referred to, AR 200, where he was warned that it was a serious case because of terrorist involvement has no linkage to the vehicle issue at all. The only other thing available to him that mentioned the material support bar was the form filled out by the credible fear officer. That's on AR 731. And that was literally a checkbox that said terrorist. And so it would have been up to Mr. Ashing to figure out that there was a link between this terrorist concept and the vehicles issue, which he didn't do. And further, I'd submit, as just a matter of common sense to your honors, if he was trying to avoid the material support bar, why would he clearly testify as he did that he repaired one vehicle? Why not just say he didn't repair any at all? If he was trying to lie and evade the support bar, I think that's the more likely thing that he would have done. So your honors, I believe that there, as you've recognized, there are grave problems with the translation in this case. Mr. Ashing did not have a fair opportunity to present his case before the IJ. The BIA relied on that faulty translation in deeming him not credible. And as your honor recognizes, I believe at minimum, Mr. Ashing is entitled to remand to do this hearing in a language that he can speak with a competent interpreter. Thank you. Thank you, your honors. The case just argued Ashing versus Barr is submitted. I'd like to thank both counsel for your argument this morning and also recognize that Mr. Ackerman is participating in the court's pro bono program, which we appreciate. And I also know the department appreciates having a well-done brief on the other side so that it's easier for oral argument. So thanks to both.
judges: Hawkins, McKeown, Bybee